Welcome to this second attempt at oral argument. We'll try to get through it this time. Mr. Davis. Thank you, Chief Judge Carnes, and may it please the Court. Jim Davis arguing for the defendants. In Gonzales, the Supreme Court held that banning one method of abortion was not an undue burden on a woman's right to terminate her pregnancy when there was another method where she could still get an abortion. No, no, no. A safe and effective other method that didn't impose a substantial burden. Yes, Judge. The rest of the sentence was not just that there's another method, but there is at least medical disagreement on whether that other method presents substantial risk to the woman. Let me ask you this. You agree that if there was no safe and effective way to cause fetal demise before DNA, that this law would be unconstitutional, don't you? Yes. Okay. And you agree if you just outlawed DNA, period, that would be unconstitutional? Yes, because at this point in time, that would eliminate second trimester abortions. So we're all up on the – we're focused on the substantial burden because of the greater risk or lack of greater risk, right? That's correct. Okay. That's correct. And it's our contention that in Gonzales, that there was plenty of medical testimony in Gonzales that the banned method, partial birth abortion, was quicker, safer, and presented less risk to the woman. But the Supreme Court held that because there is at least medical disagreement on those issues, that Congress had room to act. What was the district court fact findings in that? The district court fact finding – I know Justice Gonzales said in her dissent that the fact finding was that there was a near consensus that at least in some cases, partial birth abortion was safer. Weren't there legislative fact findings in that case? I believe that in Gonzales, yes, that there were. And there are not in our case. Detail. That's true. That's right. How do we know if the legislature made any findings? We don't. We don't have legislative history in Alabama, and there are no findings in the statute. But what we can do is know that the state interests that we're asserting here are the same state interests that were asserted in Gonzales. And those interests are protection of the life of the unborn, a right that has been recognized among the states. Let me tell you what bothers me about your side of this case and see if you can help me. The Supreme Court in Gonzales, and indeed in almost all of their precedents where they take up the issue of abortion, rely heavily, heavily on district court fact findings. Judge Thompson in this case held an evidentiary hearing. He made findings of fact. He credited the plaintiffs' experts over your experts. He gave specific reasons why he did not agree with what your experts said about the three different types of fetal demise that you suggest could be done in this case. We review those for clearly erroneous findings. How can we say those fact findings by Judge Thompson are clearly erroneous? Judge Sabino, we think that the court made some legal errors in the questions that he asked. Where we contend that the district court made a legal error is he ruled that one side of this medical debate was right and that one side of the medical debate was wrong. But we think under Gonzales the right question is simply is there genuine medical disagreement on these issues? Because the court noted in Gonzales that legislatures enjoy wide discretion to pass legislation in areas where there is medical and scientific uncertainty. In fact, what Judge Thompson found was that not that one side was right and one side was wrong, but that your experts weren't credible. And so that the evidence before the court with regard to your expert talking about how many procedures would need to be done in order for a doctor to be qualified and the other, he found that he did not give your experts credibility. So it wasn't necessarily that he said one side was wrong and one side was right. When he made the finding of fact, he said the evidence he put forth was not credible. Isn't that a slight, isn't that a distinction? It would be, Judge Abrams. But the way we read the district court opinion was not that he found that Judge Biggio was completely without credibility, but that he was entitled to less weight because he practiced in a different setting. But we think, we presented. That wasn't the totality of his finding, was it? I mean, he made specific findings on various findings with regard to the fact that the expert was in an academic setting as opposed to a clinical setting with regard to what had been observed, with regard to the fact that a lot of the findings were made based on paper and the viability of the actual studies because they weren't done in a clinical setting as opposed, or they weren't done as an actual study, but in fact were basically retroactive. So it wasn't just one, you're an academic versus you're a practicing physician. There may have been other issues, Judge Abrams, but we didn't read Judge Thompson's findings to find that Judge Biggio just didn't know what he was talking about. Well, and I'm not suggesting that, but it's also, but the bottom line I'm asking is, before we jump to I understand your Gonzales argument, you're under the impression that because, that Gonzales says that he doesn't really even get to make those findings. But assuming we don't find, I guess to go back to Judge Karn's original question, is there a basis to find his findings of fact clearly erroneous? To the extent that Judge Thompson found that there is a medical consensus against us, we do think that would be clearly erroneous. He found, instead, we read his findings to find that while there was medical disagreement, that he believed one side more than the other. Your argument pretty much rests on the act is not invalid on its face when there is uncertainty over whether the barred procedure is ever necessary, et cetera, from Gonzales. Yes. That's it. But what's the critical condition there? The act is not invalid. What's the next three words? On its face. Yes. All right. And Judge Thompson didn't find it was invalid on its face. He found it was invalid as applied. Well, he found it invalid as applied to particular clinics, and that's not a typical… The only two plaintiffs who were before him. And if it's invalid as applied to them, it's invalid as applied to them. But we contend that a proper as applied challenge, Chief Judge Karns, would be brought by a particular woman or a particular class of women. But every – I can't recall, Danforth, but at least every other abortion decision since Roe has been brought by physicians and clinics. Yes. We're not saying that women had to be the plaintiffs. It could be brought by clinics or doctors on behalf of their patients. But here… But they can only bring facial challenges? I think they could bring an as applied challenge, Chief Judge Karns, and say… Well, that's what we ended up with here, an as applied challenge. But what we contend is that it should be as applied to, for example, obese women. Okay? Judge Thompson held that one of the reasons he found that one method of inducing fetal demise was inapplicable, digoxin, is it may not work for particularly obese women. But the injunction isn't limited to obese women. We can't use it for any women. Helderstead, our whole women's clinic, did the as applied to the clinics and physicians, did it not? He held that we could not enforce the act… Not he. I'm talking about the Supreme Court of the United States. I'm sorry, Judge. I misunderstood your question. Would you repeat it for me? Well, actually, what they did in Helderstead is it was an as applied challenge, and the Supreme Court said, no, this needs to be a facial challenge. Right. It was brought as a facial challenge, and then an as applied challenge, and that's why they got to bring it a second time. But then the Supreme Court granted facial relief. And you're saying there was no medical uncertainty in Helderstead? There was medical uncertainty on a different issue. We think that Helderstead is distinguishable because the issue there was whether these admitting privileges in fact promoted health of women. That was what the state of Texas argued was the reason behind their law. That's what we argued was the reason behind the Seminole or Alabama pass. Texas didn't convince anybody, and we didn't either. And the courts just found, no, there's no nexus between the interest you're asserting and the regulation that you're defending. And here, the interests that we're asserting are the same interests that were recognized in Gonzales. But we think Judge Thompson, where the district court made a legal error, one of the ways was in applying the differences between the facial and as applied challenge. Because his reasoning, as we read it, is that these methods for inducing fetal demise had to be available for 100% of women. And that we don't think is proper in a facial challenge. The evidence is that some of these methods, according to plaintiffs, are untested before a certain stage in pregnancy. So what we think, if that was the fact finding, that the injunction should have been limited to certain stages of pregnancy, not to specific clinics, or that it may not work for a particular class of women, such as women who were morbidly obese or who had fibroids, or that some women who had difficulty traveling back a second day. So we think the proper relief was not facial relief. So you think the court can't enter as applied challenge, as applied relief to clinics or physicians. It has to be patient by patient. We think that would be far more appropriate because I know, but we're not talking about what's more appropriate. We're talking about whether the district court can enter as applied relief to a clinic or physician as opposed to a patient. We don't claim that the district court is without that authority. We claim that the evidence didn't support a blanket. Well, when does the district court have that authority? Well, we would argue that the district court has authority to enter the relief it thinks appropriate if it's supported by the evidence. And here the evidence did not suggest that all women would have trouble. So the only time the district court can enter as applied relief as to a clinic is when there would be a right to facial invalidity as to all women. To all women who would go to that clinic and seek an abortion in that clinic. So what's the difference between facial and as applied in that circumstance? It's hard to draw a line, Judge. But the evidence suggested that some women who go to these clinics to seek an abortion may have trouble with these methods. And we still contend. The evidence more than suggested that most women would be subjected to greater medical risk. I mean, did anybody testify, no, there's no medical risk as to this method? No. Every single one of them said there'd be greater medical risk, including your expert, did they not? They did. And in Gonzales, there was a near consensus that the alternative procedure, standard D&E, was riskier than the banned procedure. But the Supreme Court allowed that to go through and said that medical disagreement was reason to let Congress have it. You can't tell that from the Supreme Court's opinion, that D&E was riskier than partial birth, abortion. They did cite the testimony that at least there were some doctors believed that D&E was riskier than partial birth, abortion. The D&E involved more passes of instruments and took longer. So we do contend, Chief Judge Carnes, that in Gonzales, the court acknowledged that at least some doctors thought that the alternative procedure was riskier than the banned procedure. And we think that makes our case like Gonzales. One of the methods used, an umbilical cord transaction, our expert testified that that would not involve significantly greater risk. I don't think anybody involved. What was the specific testimony that standard D&E without fatal demise required would be riskier than D&E with fatal demise required? That's what we're talking about here. Yes, there was testimony that... From? From plaintiff's experts and plaintiffs themselves testified that they thought the methods that we suggest would be a way to induce fatal demise would raise the risk for women. No, I'm asking the converse of that. Who testified that it wouldn't raise the risk for women? Nobody. Okay, so where's the uncertainty about whether it would raise the risk for women? There's uncertainty because there's significant... The way the court in Gonzales classified it is not whether it would be zero risk, but whether it would be significant risk. And they ruled that Congress was in a better position... I'm sorry. I'm asking you where's the uncertainty. Point me to the testimony that raises the uncertainty in this case that a fatal demise requirement raises the risk. Uncertainty about that. Whose testimony? I'm not sure, and it's my fault, Judge. I'm still not sure I'm understanding your question. Your position is there's medical uncertainty about whether the fatal demise requirement is riskier than no fatal demise requirement. What is the specific evidence indicating that? Let me rephrase and say we think there's at least medical uncertainty as to whether these procedures provide an acceptable level of risk. Your argument is hard to query because you keep moving it. So there's no uncertainty that it raises the risk some? Correct. Not even no... In fact, if Judge Thompson had found as a fact from medical testimony on both sides that it didn't raise the risk some, that would be clearly erroneous, wouldn't it? Yes. Okay. Because any time there's an additional procedure of any sort, there's some increase in risk. We do not intend to dispute that. But we would point you to testimony... I thought you did because maybe I'm having a hard time pinning down your argument, but I thought you argued that this was like Gonzales because there was evidence that this procedure actually was less risky, just as the partial birth abortion, there was some testimony in Gonzales that that was less risky than the standard DNA, a DNA. Am I wrong that's not your argument? We're not contending that the risks are absolutely equal or that there's any testimony that inducing fatal demise would provide less risk. We will say, though, I will say there were some references in some studies that some doctors believe that using digoxin, for example, to terminate a fetus's life might soften the body and make the abortion easier, but we're not relying on that. I would point you to testimony from Dr. Davis, plaintiff's expert, and she said that in getting around the partial birth abortion ban, they induce fetal demise, and they do so through different methods, some of the ones that we're asserting here, such as potassium chloride and... At what stage? That's in the second trimester. At what stage, 15 to 18 or after? 18 and after. Well, that's not what we're talking about here. But in a facial challenge, Judge... No, we're not facially challenging. It's the relevant effect. The people who are... This applies to 15 to 18 weeks, does it not? That's what it has the impact on. Of course, it applies to more than that, but I guess it applies to less than that if anybody used it for that, which they don't generally. But the relevant time period and the relevant group or population of women affected are the ones 15 to 18 weeks, are they not? I think it's 15 to 20, Judge. It's all stage, all second trimester abortions. Well, 80% of the women who would be there, at least 80% of the women who are getting these procedures, are between 15 and 18 weeks, the vast majority, correct? Yes. Far more second trimester abortions are performed before 18 weeks than after. But what Dr. Davis testified is that doctors are inducing fetal demise to get around the partial birth abortion ban, even acknowledging that the procedures involve some additional risk and no benefit to the woman. But the doctors are still doing it because they're complying with the law. And we contend that that is what doctors would do in this case as well. But didn't Dr. Davis also testify that there's certain ones, I believe it's the first procedure, that they stopped, she stopped doing it because it was too dangerous, that she couldn't do it safely? There are some methods I believe that she's still using to induce fetal demise. One of these three? Judge Abrams, I could be mistaken, but I believe that some of the methods she's still using, she spoke of potassium chloride injected into the umbilical cord, for example. But there's no question that, for example, Planned Parenthood for years required clinics, or for some period of time, required clinics to use digoxin injection. They don't anymore, but they still allow it. And that involves the same steps and procedures as an injection. And when I say, Judge Carnes, that there would be some additional risk, sure, there's some risk with an injection, but that's not vastly expanding the risk involved to a woman. It's not as Judge – I didn't know it was a vastly expanding standard. It's not, but it's not a significant risk. It's not a significant increase of risk. And we contend that Gonzales – Procedure table. We contend, Judge, that in Gonzales, they didn't look at whether there was zero risk associated with the difference, but whether there's an acceptable level of risk. But in digoxin, wasn't the testimony generally consistent that 5 to 15 percent failure rate? I thought it was 5 to 10, maybe 5 to 15. But yes, digoxin may not work every time. But we don't know, on a facial challenge, why the alternatives have to work every time. Because you've got 5 to 10 percent risk of spontaneous onset of labor rupture of the membranes or development of interuterine infection. Some risk of bleeding and penetration of bowel or bladder with the needle. Does the State just say, what the heck, close enough for government work, and we're sorry about all those other folks? No, Judge, we don't mean to say that. And there are, if in a particular case it would be difficult for a woman to – for a doctor to terminate a pregnancy with digoxin through digoxin, to terminate a pregnancy through digoxin, the umbilical cord transection is a method that's also available to the doctor. And that would involve – If you can find the cord. If you can find the cord. But these are trained OBGYNs. We're not asking – Some of whom testified they couldn't find the cord. They had difficulty. Yes, and we don't understand why an OBGYN would not be able to find an umbilical cord. Let me ask you a practical question. This is an argumentative question, I've just wondered. On potassium chloride, there was a dispute about how many procedures it would take to train. Your witness said 10 to 20 potassium chloride injections would suffice to get them capable of doing it. What happens to the woman in those 10 to 20 cases while he's learning? We think that in those cases that a doctor would be observing or doing it with another doctor. If they've never done – If you miss the needle, you miss the needle. It's a hazard in neurosurgery. And what I understand about where the needle has to go, it would be a hazard here. And if you're watching – If some other doctor is watching you and you say, oh, it's too late. Well, the potassium chloride injections, I think what Dr. Bezier was talking about is a doctor could observe it done and then do it alongside another doctor. And same with the digoxin injection, which would be far easier than potassium chloride. I see my time is up. If there are no more questions for me at this time,  More questions. Okay, you've got your full rebuttal time. Thank you, Jeff. Mr. Beck. You don't look like an Andrew to me, but whoever you are, we welcome you to. Thank you very much, Your Honor. My name is Alexa Colby Melinas, and I will be arguing for the plaintiffs. Your Honor, nothing in the law and facts have changed since Stenberg and Gonzales were decided. D&E remains what was, in Gonzales' own terms, the commonly used and generally accepted method for providing second chances. Let me ask you this. If it was commonly used and it was used in 80 percent of the cases and there was some breakthrough and the state said the breakthrough method is far more humane, we mandate you use that. The fact that it was used in 80 percent of the cases at the time that the state imposed that requirement, if the new method was just as safe and just as effective, it wouldn't matter that you had a majority of people, a clear majority of people using it, would you? Your Honor, if the new proposed method was just as safe, just as feasible, and just as widely available, then yes, I think the facts may be different. So the fact that its predominant method just reflects the underlying facts that we can get at other ways about whether it's just as safe and just as effective and available. Exactly, Your Honor. As the Supreme Court recognized in Danforth, which was the first case to examine this issue, the prevalence of the method reflects what the medical community, of course, has determined to be the most safe and feasible and effective and a widely available method. And that's exactly what the case is here. D&E remains used in over 95 percent of cases nationwide, and of course in Alabama, in the outpatient clinics, in 100 percent of cases after 15 weeks. And that remains the case today, that if a ban on D&E would have an undue burden, just as it would have in Stenberg and Gonzales, because it would have the effect of prohibiting the most commonly used and generally accepted procedure. Your Honor, the state relies on a misreading of Gonzales to really argue for a different result here. In Gonzales, they are ignoring the context of that decision and really ignoring the threshold holding that Gonzales made, which was first to ask whether or not the law at issue was banning D&E, because as here, D&E was the most commonly used and generally accepted method of performing an abortion at that time. And it was only after deciding that the federal partial birth abortion ban did not reach D&E that it even went on to ask the question of whether the ban on the rarely used method could be upheld because of the availability of alternatives. And again, to correct what my colleague said before, in fact, the evidence in Gonzales and the Supreme Court decision in Gonzales is incredibly clear that the evidence was undisputed that for every woman, D&E was a safe and acceptable method. I saw that dispute in the briefs or somewhere. Where do you get your reliance on that fact? Where is that fact set out in the opinion? I just didn't see it. Sure, Your Honor. Times as I read it. There is definitely, it's around, I think my colleague will get it for me, but I think it's around pages like 160 to 165, but he will certainly. It's in the opinion as opposed to the record. Oh, it's in the opinion of Gonzales, Your Honor, because what the dispute in Gonzales was was over whether the rarely used method was ever safer. There was no dispute that D&E was safe, but there was dispute between comprehensive detailed legislative fact findings, which of course we do not have here, and comprehensive detailed district court fact findings over the safety of that alternative for a subset of women, whether it was better, whether it was preferable for them. But given that nobody disputed that the commonly used and generally accepted D&E method was safe for all women, the court was unwilling to strike that law on its face. This is a quite different circumstance here where it is the commonly used and generally accepted standard and predominant method that the state is seeking to ban and instead is seeking to impose on women. Let me tell you one thing that kind of stood out to me from Judge Thompson's opinion. He appeared to be unwilling even to concede that the state had a valid interest. Your Honor, he does. I don't sense that same reluctance in your brief. You argue that, okay, if you could do this in a safe and effective manner, that is a valid interest. If you could administer fetal demise in a, quote, more humane way than dismembering a fetus while its heart was still beating, that is a valid state interest. Maybe not one you would agree with and maybe not one you would pass judgment on, but it's a valid state interest. Do you contest that? We do not contest that in the abstract. Of course, the Supreme Court can't. No, I'm not talking about the abstract. I'm just talking about as a factual matter. I don't know if you can have a factual finding about a state interest, but that is a valid state interest if it could be done without a substantial burden. If the interest can be advanced in a constitutionally permissible manner, then yes. Yeah, well, of course, right. You have to have a valid state interest. You have to have a valid state interest. Okay, that's all I'm talking about. Judge Thompson would not even concede that. He simply said assuming for present purposes. What's the possible justification for that? Well, what he said, Your Honor, I believe, is that he assumed given that there were no legislative fact findings, so, of course, there was no assertion of what the state's interest in passing this ban was. He was going to assume, give them the benefit of the doubt, that they were motivated by the interest that was recognized as legitimate in Gonzales. Well, there are no legislative fact findings in most state legislation that I've seen, and in virtually none of Alabama's. They've got one or two in this area that do have it. But courts don't say we're assuming they had some valid purpose. But you didn't write that, so I've taken up enough of your time on it. Thank you, Your Honor. I also wanted to address, I can give you the cite to Gonzales if you would like. Let's wait on that. I can find it once I know it's in the opinion. Let me ask you this. Judge Thompson said there is no evidence that fatal pain is a biological possibility under 29 weeks. One of the amici, I guess it was the pro-life OBGYNs, said it was. And they don't contest, as I understand. But I was curious, what's the evidentiary basis of no pain before 29 weeks? Was there testimony about that? There was some testimony about that, Your Honor, in this case. Of course, because it wasn't contested and it wasn't an interest that the state was even asserting or an argument they're making, it wasn't extensive. But it does have to do with development of the fetal cortex. And until certain developmental advancements are in place, pain would not even be a biological possibility. And so the evidence in this record is that that is not possible before 29 weeks. And that was based on testimony as opposed to extra evidentiary sources? That was testimony from experts, yes, Your Honor. Okay. All right. Thank you. You're welcome. I would also like to address, in addition to, I think, the misreliance on Gonzales and all of the cases that preceded it, there has also been a misunderstanding of the district courts, clearly well-supported findings in this case that were essentially based on an undisputed evidentiary record. There is essentially no debate here that the methods that the state is proposing are not only unfeasible and ineffective to rely on to circumvent a criminal ban, but that they also impose risks. In fact, the state's own witness said that digoxin, which is by far, if anybody is to use demise, it is the easiest to use, said that that imposes risks, unreasonable risks, on every woman to whom it is subjected. And it is unreasonable to expect a physician to administer that to his patients. And that is not even counting the fact that before 18 weeks, it is untested and an experimental procedure. Your statement three sentences before reminded me of something. There are statements throughout the district court opinion, and I think also in your brief, that the state had failed to prove that fetal demise offered any medical benefit. There is no requirement that the state, if it doesn't impose a substantial burden, can't require a particular method unless it has a plus medical benefit. Suppose the stipulation, and I know it will never happen, but suppose the stipulation is this is exactly as safe as the other one, not one-tenth of a percent, either way, difference. The state doesn't have to show a medical benefit, does it? Your Honor, I think it would depend, because I think one aspect of the conclusion that an additional method doesn't have a benefit is also what is it forcing the woman to undergo. So here, the additional... It's forcing a woman to undergo a procedure that's just as effective and just as safe as the other procedure. It takes not an extra day, doesn't take an extra minute. It's just the state's way of saying this is more humane. Your Honor, if I'm understanding, if we're talking about the difference between the abortion procedures, then I think I do agree. If we are talking about requiring a woman to undergo additional medical procedures merely as a precondition to exercise a constitutional right, I think that raises more bodily integrity questions. Well, that would also just feed into whether there's a substantial burden. You can have a substantial burden that doesn't relate to a medical risk is my whole point. And the fact that all of the things being equal, the mere incursion on choice per se, if there's not a substantial burden with the choice that the legislature makes, as I read it so far, has not been outlawed, has not been ruled unconstitutional. It is when the state's choice imposes a substantial burden on the woman's choice previability that there's a constitutional problem. Now, am I wrong about that? No, you're correct, Your Honor. I think if I understand the statement that, yes, what is unconstitutional is to impose the undue burden on the woman's ability to exercise her right to abortion. Of course, that often coincides with what is generally practiced in the medical community because what the medical community practices is what's best for their patients. But, yes, the right is of the woman not to. And what's available, which ties into the burden of getting something that's not widely available. Exactly, Your Honor, which was, of course, the situation in Danforth where the alternative that the state of Missouri was proposing there was not only experimental but was simply not available in the state of Missouri. And that is relevant to the constitutional test. Let me ask you this about the as-applied. If a new abortion clinic opens in Alabama, as unlikely as that is, but if one does, the state can enforce this statute against that clinic, can it not? Absolutely. And that's the difference, really, between as-applied. That's the difference between the as-applied remedy and the on-its-face remedy. Exactly, Your Honor. It can also enforce the law against its own expert, Dr. Biggio, at the University of Alabama-Birmingham. They rarely do abortions, but they are subject to this law. So the law, and I've read it, I should know, but the law doesn't specifically peg its restrictions to outpatient. No, it is to the performance of the procedure itself. Now, did Biggio explain when he performed these? It is sometimes performed. He did testify that that procedure is sometimes performed in that hospital before 17 weeks. Which would be permitted by the statute or not? Not unless they induced fetal demise or found another way to work around the ban, as of today. Or unless it presented a medical necessity, which is unlikely, earlier as opposed to later. Exactly, Your Honor. I'm sorry, I took up a bunch of your time. Go ahead. No problem, Your Honor. I wanted to just continue to address some of the issues about the record. In addition to saying there's no debate among any of the experts about the risks, and no debate about the unfeasibility, and no debate that these are not reliable and effective methods, it very much mischaracterized Dr. Davis, the plaintiff's expert's testimony, on the point of using demise. Dr. Davis testified that in the wake of the partial birth abortion ban, she did, as a way to try to attempt to comply with that, or to demonstrate compliance with that decision, she did attempt KCL injections and abandoned that because of the threats to her patients. Applying to me, that's a way she was concerned into doing, as opposed to just a standard D&E. Standard D&E isn't birth into the birth canal and then fatal demise, is it? It is not, and that is exactly how she does comply today with the partial birth abortion ban, and is how most doctors comply. I think in the wake of the decision, because of the way the Supreme Court had construed that statute, there was fear about how you could demonstrate that that was never your intent to perform the banned procedure. And so that was something that people explored as a way of demonstrating compliance. But, of course, she attempted KCL, abandoned that, attempted Digoxin, abandoned that. What she does today is actually when she performs the partial birth abortion procedure, the actual procedure, the rarely used variation that was banned in Gonzales, that is when she attempts fetal demise so as to be able to be in compliance with that. And those are only for patients who are very far along in pregnancy for whom she does believe the banned procedure would be safer. And even then, that's after three days of dilation, she is able to access the cord and inject it with potassium chloride. It's an entirely different context. And even then, if it doesn't work, which it doesn't always work, she performs the standard D&E. And that is the option that would, of course, not be available to any physician in Alabama because this law prescribes that procedure. And, in fact, there is nowhere in this country that anybody, even the minority of physicians who are currently attempting demise, nowhere are they doing so without the ability to perform a standard D&E if it is difficult or impossible to administer or if it simply doesn't work. And there's nowhere where they're facing a criminal ban if they were to perform lawfully and safely complete the abortion procedure. What about Dr. Parker's testimony that his dilation procedure often kills the fetus? He observed, Your Honor, that sometimes the method of dilation that he used, he believed, resulted in fetal demise. I think that hardly amounts to anything more than an anecdotal observation. And, if anything, it demonstrates that even that doesn't work every single time. And, of course, at that point, he needs to be able to perform a D&E to lawfully and safely complete the procedure. So although I think that that would certainly fall under what would be considered experimental or not commonly used or generally accepted, to use the Gonzales language, he did testify that even then it doesn't work all the time and would still need to be able to perform a standard D&E to complete the procedure. Your argument doesn't rest heavily on the medical ethics prong, does it? A medical ethics argument contention, does it? I think that is part of the factual, I think, argument. I think the effectiveness and unfeasibility of relying on these methods as a way to circumvent a criminal ban and then in terms of the risks and experimentation that it would require doctors to impose on women, that is unethical and that is also an understatement. What about, I thought it was undisputed, that some doctors do use fetal demise before D&E? Never in this context, Your Honor. So, first of all, what doctors, if they use demise, they most commonly would use Dijoxin. Nobody is using it before 18 weeks when 80% of abortions are taking place. And, as we know, potassium chloride is really only the province of specialists who perform it in hospital settings. Has the Dijoxin been risky before but not after 18 weeks? Is that what your position is? It's experimental and untested and unstudied before 18 weeks. You wouldn't know the dosage. You wouldn't know how long it would take. You wouldn't know if the side effects would be different because you perhaps have to increase the dosage. I understand that argument. It's been used after but not before. A significant number of times after but not before. But still, you can't use it if it increases the risk. It's a matter of medical ethics, not constitutional law. If it increases the risk and offers no countervailing medical benefit, can you? I think for doctors who do use it under the fear of prosecution under the partial birth abortion ban, they have weighed the risks and benefits and believe that the ability to complete the procedure for their patients outweighs those risks. But you are correct that it doesn't change the fact that the evidence shows that it imposes risks. And, again, even those doctors who are doing it under those circumstances are always able to perform a standard D&E if, for some reason, it's difficult, if it's impossible to administer, if it's contraindicated for the woman for some reason, or if it fails. I would like to address the fact, Your Honor, about Planned Parenthood. Of course, Planned Parenthood is another example of a case that, in the wake of the partial birth abortion ban decision, required the use of Digoxin only after 20 weeks, but then, of course, abandoned that. And it is now only permitted, and again, only after 18 weeks. Your Honor, the virtually undisputed evidentiary record here shows that the state's so-called workarounds to the ban would impose an undue burden not just because it would make D&Es unavailable because these are ineffective, but because it would force every woman seeking an abortion after 15 weeks to undergo a painful, unnecessary, experimental, and riskier procedure. And nothing in Gonzales supports that, and nothing in any other Supreme Court case supports any state interest allowing the state to inflict those harms on women seeking abortion, seeking to exercise their constitutional right. Let me ask you a question that bothers me as a matter of legal doctrine that may have ramifications beyond this case. The whole idea of third-party, as-applied standing, basically, third-party standing, which is what we're talking about here, really, these clinics, albeit in the, when Scalia said there's constitutional law and then there's abortion law, albeit in the abortion context, where these clinics are permitted to make an as-applied challenge basically on a facial application theory. And by that, I mean the state could come forward and say, listen, here's a stipulation we've entered into, Your Honor, and the stipulation is there's a woman that lives over there in DeKalb County, and both sides agree she's just, whatever reason, this would not be a substantial burden as to her. In fact, she might well benefit from it. So you can't entertain a facial challenge because it has to be unconstitutional as to everybody. It can't be one person that it wouldn't violate the Constitution to apply it to. So this woman, it wouldn't. Yet by giving the clinics third-party standing on behalf of a class of women, their patients who are having abortions in this category, you are, in effect, giving class relief to all of their patients, even though some of the patients, I say class, facial relief as to all of their class of patients, even though some of the women under my hypothetical, and it's heavy on the hypo part of the hypothetical, even though some of the women it could be constitutionally applied to. So isn't that an argument against as-applied standing for clinics and physicians, as-applied relief for clinics and physicians, as opposed to facial relief for clinics and physicians and their patients? Your Honor, I will attempt to answer the question. I'm not sure I understand or that you will think. Suppose that one woman goes to that clinic, or four women go to that clinic for whom this would not be, for whatever reasons, would not be a substantial risk or substantial burden. It would for the other 98.9 percent, but not for these four women. By, in effect, saying we give the entire clinic and all of its patients and all of its physicians the effect of invalidating this statute as to them, you are, in effect, giving facial relief to the clinics and the patients, even though some of them are not entitled to it because it would not be a substantial burden as to the four. Well, Your Honor, I'm not sure that that's an issue with third-party standing as opposed to what the Supreme Court has held is the test for facial relief in abortion cases, which is not Salerno but the large fraction test. Well, they then said, oh, but that's, you know, when Kennedy got the other four, Kennedy says, oh, but that's debated now. You know what I'm talking about. He says it's debated, but we need not decide. In whole women's health, they make very clear that the test for facial relief in the abortion context is the large fraction test. It is not the Salerno test. So if the law is unconstitutional for a large fraction of women for whom it is relevant, that is how it was explained in Casey but definitely affirmed in whole women's health, then it is unconstitutional on its face. I don't think that is a bug of the third-party standing doctrine as much as it is what the Supreme Court has held the test for facial relief is in the abortion context. I know that may not be satisfactory, but I believe that is why that relief is perfectly appropriate and legal under how the Supreme Court has set forth how these cases are to be decided. Gonzales said as applied is the way to go, but then they as applied it to the, not to the individual women, but to the physicians in clinics. As applied when there was uncertainty that it was necessary for any woman, yes, that is what Gonzales held. Of course, in whole women's health where it found that the laws would have imposed an undue burden on a large fraction of women, it did not hesitate to strike the Texas laws on their face. Even though as applied relief was requested by the plaintiffs with respect to at least one of those laws, the court decided it had to strike them on its face. Maybe the court was worried about what I am worried about, which is an as applied is not the same thing as a facial for the reasons that we have stated, which is if one of those people, women, that the clinics were representing could be constitutionally applied to, then that screws up the whole facial relief thing. They will just take care of that by converting it to facial relief. Do you think that the Supreme Court has held that these do not have to be litigated by each individual woman as she is currently seeking her abortion based on her current circumstances? I think that is the purpose of the large fraction test because as explained in AOT, where there is a constitutional violation, the court needs to be able to give relief, of course, without rewriting the entire statute. Of course, that is essentially what the state is asking for here when they are discussing as applied relief as to obese women or as to women for whom one injection fails or as to women for whom you cannot find the cord. This is a law that was on its face, says nothing of demise. It says nothing of attempting demise. It merely bans D&Es on its face. The as applied relief that they are truly seeking here is really for the court to take out its pen and rewrite the law as to various circumstances in which it could potentially be applied. That is simply not the province of a court. Legislatures are not entitled to write blatantly unconstitutional laws and ask the courts to wholly rewrite them in an effort to fix them. I would like to finally address the issue of the undue burden test and the state's arguments that for somehow Whole Women's Health has created a different undue burden test for regulations that are motivated by an interest in women's health and somehow a different undue burden test should apply in this case. Of course, Whole Women's Health no more created a new undue burden test than Casey created a separate undue burden test for parental consent laws and Stenberg created an undue burden test for method bans and Whole Women's Health created an undue burden test for health regulation laws. If Whole Women's Health makes anything clear, it is that from Casey to Gonzalez to that case, it is a single undue burden test. It doesn't matter the interest that the state is asserting. It is the same test and that is the test that the district court properly applied below and is the test and the result they reached is consistent with the Supreme Court's holdings in Danforth, Stenberg, and Gonzalez. The court does not have any other questions. I have one and it has nothing to do with the merits of any of this and everybody agrees but my mind rebels at it. And that is how can the gestational age be older than the fertilization age, post-fertilization? You've handled a bunch of these cases. Surely you must know the etymology of that. I do, Your Honor. How can you have gestation without fertilization? So the reason why the way physicians measure pregnancy is actually from the date of the woman's last menstrual period which is estimated to be two weeks before implantation. And so it's because nobody really knows the instant at which implantation takes place. And they ought to get a word that better describes it like LMP, you know, age. That I'm fine with, Your Honor. I will certainly take that. I think sometimes the medical profession invents names just to make the rest of us realize that we're not doctors and that just makes no sense. I can't dispute that, Your Honor. As I said, it has nothing to do with the merits. And I appreciate that explanation and apologize about your name. Not a problem. And Mr. Davis. Thank you, Judge. There was testimony in the district court, yes, that these procedures would increase risk. But that's true when they're used by doctors. In other cases, as Ms. Colby-Molina said, doctors today, it may be a minority of doctors, but there are doctors today who use these same methods to induce fetal demise even though they acknowledge that there's some increased risk as there is for any injection, even a flu shot or anything else that a doctor does. But they've determined that even though there's some risk without any corresponding benefit, that they will do it in order to comply with legislative bans such as the partial birth abortion ban. So we believe that doctors will do that here as well. As Justice Kennedy said in Gonzales, the medical profession may very well find different and less shocking methods to conduct abortions in light of bans like the partial birth abortion ban. The right here that's being asserted belongs to women, not to clinics. We continue to believe that the way these challenges should be brought are either by women or by the doctors on behalf of women asserting that these procedures won't work in certain cases. Although, yes, there is testimony that these procedures are not tested before a certain period, but we're banned from using it in any situation at these clinics. How do they bring it on behalf of a specific woman, given the pregnancy measured from either the gestational or post-fertilization stage? I mean, how do you get these through? Yeah, I think you could get these through. I think the clinics could bring a claim on behalf of, for example, a class of patients who are obese. I don't think they have to wait until someone shows up. They could bring it on behalf of a certain class of women. And who are pregnant. Yes, yes. But still, we'd have to have a final decision within nine months, wouldn't we? We would, but I think they could bring it for patients and future patients too. And I think that this could be brought. These cases can be handled quite quickly. Who intend to get pregnant and then get an abortion? Come on. Okay. That's less likely. But we do think that still these issues would be better brought in an as-applied challenge. And while there's risk involved in absolutely any procedure, we think, as I said, that many doctors have determined that these are an acceptable level of risk in order to comply with legislative bans. And as the court said in Gonzales, Considerations of marginal safety, including the balance of risk, are within the legislative competence when the regulation is rational and in pursuit of legitimate ends. When standard medical options are available, mere convenience does not suffice to displace them, and some procedures have different risks than others. It does not follow that the state is altogether barred from imposing reasonable regulations. So we believe it suggests that the district court should be reversed in this case. Obviously, that's our argument, that we believe Gonzales is controlling and requires reversal. If you disagree and determine that Supreme Court precedent requires that the district court be affirmed, we would ask that an opinion at least acknowledge one thing, that this procedure, the dismemberment abortions, it is a monstrous procedure. And it is not unreasonable for Alabama to want doctors to use another in a more humane way. Casey acknowledged that states have a profound right in the life of the unborn, and I don't hear any disagreement with that from my colleagues on the other side. In Gonzales, if it means anything, I think it means that states, as Justice Kennedy says, can profess profound respect for the life of the unborn. That means that we can pass laws, we believe, that says that this that you're aborting is not merely the product of conception. It's an unborn child. And we certainly cannot put up a substantial obstacle in abortion. I understand that, but you think we'd have more credibility on that than Kennedy and Thomas and, my goodness, even Ginsburg? You would with me, but I don't – That's probably true. But we would like an opinion that acknowledged that and that the state – acknowledged the state's profound interest and that this is a monstrous procedure. You would like, as I believe it was Holmes said, for us to look the facts in the face, whatever the law applies to them. In other words, acknowledge the true facts and then apply the law to it. Yes, yes. But there are a lot of opinions that I've seen that argue that this is the law and we're required to rule this way, but maybe this shouldn't be the law. And we do think that the state does – has a profound interest here in the life of the unborn. And it's not unreasonable for us to suggest that this be handled in a more humane way. We urge the court to reverse. Thank you. Thank you. Appreciate the argument on both sides. We will take that case under submission. All rise.